Steven J. Shamburek
ABA No. 8606063
Law Office of Steven J. Shamburek
425 G Street, Suite 610
Anchorage, Alaska 99501
Telephone: (907) 522-5339

Attorney for Plaintiff/Petitioner

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA AT JUNEAU**

IN THE MATTER OF THE COMPLAINT )
OF ANGELETTE, LLC**,** an Alaska )
limited liability company, Owner of )
the T/V KUPREANOF, Number 562486 )   IN ADMIRALTY
for exoneration from or limitation )
of liability, )
                            )
          Plaintiff. )
_____)   Case No. 1:15-cv-00012-SLG

<u>**PLAINTIFF'S/PETITIONER'S OPPOSITION TO MOTION FILED BY YOLANDA PEREZ OROZCO AND MARCOS CARRILLO AND JOINED BY STEPHEN BERRY AND PALMER THOMASSEN**</u>

Plaintiff/Petitioner ANGELETTE, LLC, as owner of the T/V KUPREANOF, files

this OPPOSITION TO MOTION FILED BY YOLANDA PEREZ OROZCO AND

MARCOS CARRILLO and joined by STEPHEN BERRY and PALMER THOMASSEN.[1]

Plaintiff/Petitioner incorporates the analysis and discussion in its

MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

FOR EXONERATION FROM LIABILITY, MEMORANDUM IN SUPPORT OF MOTION

FOR PARTIAL SUMMARY JUDGMENT REGARDING WAGES, MAINTENANCE AND

_____

[1]    Dockets 67, 69 and 70, respectively.

1

1  CURE AND PERSONAL PROPERTY and MEMORANDUM IN SUPPORT OF

2  MOTION TO STRIKE REBUTTAL REPORT.[2]  Plaintiff/Petitioner also incorporates its

3  analysis in its REPLIES to the OPPOSITIONS to these three MOTIONS.

4                              **Introduction**

5       In their disclosures, Claimants never identified any unseaworthiness or

6  negligence.    In their discovery responses, Claimants never identified any

7  unseaworthiness or negligence.  Claimants do not adduce any facts to suggest that the

8  Vessel was unseaworthy when it left Petersburg, Alaska on the morning of June 7,

9  2015.  Claimants do not adduce any facts to suggest that the owner was negligent.

10      Claimants acknowledge but do not address the fuel burn procedures

11  undertaken by Captain Berry and Engineer Palmer Thomassen that caused the sinking

12  of the Vessel.  Claimants perforce do not even attempt to come forward with evidence

13  that the Plaintiff/Petitioner had any "privity or knowledge" of the act that caused the

14  sinking.

15                              **Discussion**

16      The two surveys of the Vessel by Mr. Thomas Pope describe the KUPREANOF

17  as "immaculate"[3] and provide a detailed and careful discussion of the Vessel's hull,

_____

[2]     Dockets 78, 74 and 72, respectively.

[3]     Affidavit of Thomas K. Pope, Exhibit R, Docket 76 (unsigned) and the two attached surveys.  Docket 76-1.  The signed and notarized affidavit is to be filed and also marked as Exhibit R with the new docket number.

Case 1:15-cv-00012-SLG   Document 82   Filed 02/12/18   Page 2 of 50

gear, machinery, equipment, condition and history. The Survey of the Vessel dated

September 3, 2014 states in pertinent part: "This vessel is immaculately kept, well

maintained, in EXCELLENT CONDITION, fully equipped for her intended service. . . .

Electronics inventory is complete, redundant, and of recent vintage. **Interior is well**

**finished & immaculately kept including all machinery spaces & lazerette.**"[4] In his

affidavit, Mr. Thomas Pope authenticates the two surveys and states in pertinent part:[5]

> 3.    In the September 29, 2013 F/V Kupreanof Condition & Valuation Survey, I describe the F/V Kupreanof in good condition as follows:
>
> 4.    The Vessel was surveyed afloat.   The Vessel was found to be "**immaculately kept, well maintained and considered to be in excellent condition.**"  The Vessel hull was audio gauged by the owner, Mr. James Edson, a marine surveyor, in the Spring 2013 drydocking.  The Spring 2013 drydocking revealed the hull to be without defects.   **The Vessel interior finish was professional and immaculate and the machinery spaces, holds and lazarette compartment are spotless.**
>
> 5.    In the September 3, 2014 F/V Kupreanof Condition & Valuation Survey, I describe the F/V Kupreanof in good sound condition as follows:
>
> 6.    The Vessel was surveyed afloat.   The Vessel was found to be "**immaculately kept, well maintained and considered to be in excellent condition.**"  The Vessel was last spot audio-gauged by the Vessel owner, Mr. James Edson, a marine surveyor, at the September, 2012 drydocking and no defects or hull thinning were found.  The entire Vessel was "immaculately kept" including all machinery spaces.   **The "Interior was well finished and immaculately kept including all machinery spaces and lazarette."**

---

[4]    The two Surveys are attached to Exhibit R, Docket 76-1 (capital letters in original; emphasis added).  The September 3, 2014 survey is also attached as Exhibit A at Docket 22-2, p. 2.

[5]    Exhibit R, Docket 76 (unsigned), p. 2 (emphasis added).

In written discovery,[6] Captain Berry was asked and responded:

> INTERROGATORY NO. 8: With respect to the KUPREANOF, please set forth, including the date, approximate time and location of the KUPREANOF, the last time you are aware of a person checking 1) the seal on the lazarette hatch; 2) the lazarette hatch; 3) the tightening mechanism for the lazarette hatch; 4) the interior of the lazarette; 5) the water pump for the lazarette; 6) the float to the water pump for the lazarette; 7) the audio and/or visual alarm for the water pump and/or float for the lazarette; 8) the packing and/or packing gland for the rudder; 9) the cutlass bearing; 10) the packing and/or packing gland for the shaft; 11) the seal between the shaft alley and the engine room.
>
> RESPONSE: 1) <u>I checked the lazarette hatch to make sure it was secured **before** Jay tied equipment over it on or about May 20, 2015.</u> 2) See number 1 above. 3) Unknown. 4) Unknown. 5) Unknown. 6) Unknown. 7) <u>I checked a few days prior to leaving from the pilot house alarm panel.</u> 8) Unknown. 9) Unknown. 10) Unknown. 11) Unknown.

Captain Berry testified that he had an opportunity to inspect the lazarette, lazarette hatches, etc. before any equipment was loaded in the aft of the Vessel. In written discovery,[7] Captain Berry was asked and responded:

> REQUEST FOR ADMISSION NO. 19: Please admit that at the end of May or early June 2015, <u>the previous owner of the KUPREANOF, Mr. James W. Edson, provided an orientation, described the engine room and/or discussed the operation of the refrigeration equipment and other equipment with Captain Berry and Engineer Palmer Thomassen on board the KUPREANOF</u>.
>
> RESPONSE: Admits.

---

[6]     Exhibit I, Docket 75-2, p. 4 (emphasis added).

[7]     Exhibit I, Docket 80-6, p. 8 (emphasis added).

4

1  The prior owner, Mr. James Edson, is a marine surveyor who maintained the Vessel

2  immaculately.  The one mariner with the most knowledge of and experience with the

3  Vessel, Mr. James Edson, described, discussed and oriented Captain Stephen Berry

4  and Engineer Palmer Thomassen.

5      When Captain Berry was asked whether the U.S. Coast Guard safety

6  detachment personnel performed a safety inspection and ensured that a safety sticker

7  was issued for the Vessel, he responded that it had been done "just prior to my coming

8  aboard."[8]    The U.S. Coast Guard Vessel Safety Check is thorough and

9  comprehensive.[9]  When asked if he agrees "that as a captain of a vessel it's your

10 responsibility to ensure that the vessel complies with Coast Guard safety regulations,"

11 Captain Berry answered "Yes" without pause or hesitation.[10]

12     Some of Captain Berry's duties and Engineer Palmer Thomassen's duties are

13 set forth in their contracts.[11]   Each was obligated to inspect the Vessel before

---

[8]     Exhibit N, Docket 80-1, p. 23, l. 12 – p. 24, l. 6.

[9]     The Coast Guard Vessel Safety Check form is available and is discussed at
https://www.usps.org/national/vsc/formtool_files/a7012.pdf

[10]    Exhibit N, Docket 80-1, p. 24, ll. 2 - 6.

[11]    Stephen Berry Contract, Exhibit B, Docket 22-3 and Palmer Thomassen
Contract, Exhibit C, Docket 22-4.

5

departure and report any concerns to the owner.[12]   In his employment contract at Item 10.d., Captain Berry's Contract states:[13]

> Captain will, upon boarding the vessel, <u>examine the gear and machinery in the area of which the Captain will be working</u> and <u>will immediately advise the owner if Captain finds any condition in that area or elsewhere onboard the vessel to be unsafe.</u>

Neither the telephone or text logs provided, reviewed and attached reveal that Captain Berry ever contacted Jay Thomassen regarding any issues with the Vessel's hull, machinery or other components necessary for a safe voyage, as required by his contract.   At Captain Berry's deposition,[14] he stated that did not contact Jay Thomassen regarding any safety or seaworthy condition on the Vessel after departing Juneau or afterwards.  He only reported that the satellite phone was not working.

Mr. McFarland's Expert Report is an exhaustive summary and discussion of the testimony of the four Claimants and Mr. Jay Thomassen and focuses on 1) Experience and on 2) Vessel Conditions including Alarm and Bilge Pump Operation; 3) Ballast; 4) Ballast Procedure; 5) Deck Weight; 6) Lashing Deck Gear; 7) Vessel Freeboard; 8) Vessel Trim; 9) Anchor Equipment Operations; and 10) Machinery including the a)

---

[12]   <u>Id.</u> at Exhibit B, Docket 22-3, p. 4, para 10.d. and Exhibit C, Docket 22-4, p. 4, para 10.d.

[13]   Exhibit B, Docket 22-3, p. 4, para 10.d. (emphasis added).

[14]   Exhibit N, Docket 80-1, p. 76, ll. 2-12.

1  main engine, b) auxiliary engine, c) steerage, d) navigation and e) other systems.[15]

2  Each Claimant's description of the Vessel supports the conclusion that the Vessel was

3  in sound and in good serviceable condition up to 3:15 a.m. local time on June 10,

4  2015.

5      All four Claimants testified in detail to the Vessels' stability when it left

6  Petersburg and Juneau and while in route.[16]  Each Claimant was asked specifically to

7  testify regarding 1) the yaw, 2) the pitch (fore and aft motion), 3) the roll (starboard and

8  port motion) and 4) the freeboard of the Vessel during the voyage.  Each Claimant

9  testified that the Vessel was stable at all times in all three axis and had adequate

10  freeboard from the departure at Petersburg up until about 3:15 a.m. on June 10, 2015.

11      The location of the fishing equipment on the Vessel contributed to the

12  undisputed stability of the Vessel when it left Petersburg and throughout the voyage.

13  The Vessel was loaded with standard salmon fish tender equipment that, according to

14  historical information provided by the previous owner, Mr. James Edson, was the

15  equipment he sold with the Vessel to Angelette, LLC.  Mr. Edson loaded this equipment

16  on the Vessel deck and utilized it or similar type for approximately 22 years of his

---

[15]    Jack McFarland Expert Report, Exhibit M, Docket 75-6.

[16]    Stephen Berry Deposition, Exhibit N, Docket 80-1, p. 42, l. 18 – p. 43, l. 9 and p.
46, l. 8 – p. 49, l. 4.  The testimony of the other three Claimants is discussed in detail in
Plaintiff's/Petitioner's MEMORANDUM.  Docket 78.

7

1   ownership of the Kupreanof, with occasional heavy weather conditions, without any
2   reported incident.

3       There is no testimony that reveals the Vessel freeboard or trim were
4   compromised by the loading of the deck equipment.  No crew stated a loss of
5   freeboard or any list until approximately 3:15 am local time on June 10, 2015 when the
6   Vessel listed to port.  Therefore, the deck load and location of the tender equipment
7   was not a factor in the loss.

8       Captain Berry describes the Vessel, after placing onboard full fuel and a deck
9   load of tender equipment, to have been stable and "perfect" from the day of departure
10  from Petersburg, Alaska on June 7, 2015[17] and from Juneau[18] up to approximately
11  0315 (3:15 am) on June 10, 2015, local time, when the Vessel took a sudden list to
12  port and did not recover.

13      Captain Berry discussed the operation and condition of the pumps and alarms
14  specifically and in detail as follows:[19]

15      Q.     So if we could just summarize that – **you said that all of the**
16             **pumps were working according to the gauges, did you say?**
17
18      A.     **Panel.**
19
20      Q.     And that was in May of 2015?
21

---

[17]    Captain Berry testified: "She was riding just perfect." Id. at p. 48, l. 17.

[18]    Captain Berry testified: "She was running just perfect then too." Id. at l. 20.

[19]    Id. at p. 21, l. 9 – p. 23, l. 11.

8

1   A     Yes.
2
3   Q.    Okay.  Did you check any of these pumps – you checked them in
4   Petersburg.  Did you check them in Juneau?
5
6   **A.    All the circulation and hold pumps were all working prior to**
7   **departure from here.  We tanked down, single-tanked it, ran up to**
8   **Juneau.  All those pumps worked.  <u>As far as the pump in the lazarette</u>**
9   **<u>goes, it was working after we left.</u>  All we did we manually check it**
10  **and used fresh water to time it.**
11
12  Q.    And how many alarms were on the vessel in May of 2015?
13
14  **Q.    You know, I venture to say -- as near as I can remember on the**
15  **panel, there was probably about ten of them.  There might have been**
16  **more than that, because everything had an alarm on it.  <u>And all the</u>**
17  **<u>alarms tested positive.</u>**
18
19  A.    <u>**So they all worked?**</u>
20
21  **A.    <u>Yes.</u>**
22
23  Q.    <u>**So that would be – there would be an alarm for the lazarette?**</u>
24
25  A.    <u>**Yes.**</u>
26
27  Q.    And one for the engine room?
28
29  **A.    Yes.**
30
31  Q.    And I've heard somebody talk about sirens.  Is there something
32  different between an alarm and a siren?
33
34  **A.    There's a couple different alarms.  You know, like we had the**
35  **refrigerator – or the freezer shut down one day, and so there was a**
36  **different kind of bell for that.  And the more – how do you say it – the**
37  **more serious the situation, it would be – there wasn't a siren, but**
38  **there was a different kind of a – a different kind of a warning kind of**
39  **between a bell and a siren.**
40
41  Q     How many sirens are on the vessel?

9

A.   I don't know.

Q.   But you checked all of the alarms and sirens in Petersburg?

A.   **Yes.**

Q.   And did you have a chance to check them in Juneau?

A.   **Yes.  We checked all the bilge pumps, bilge alarms, and everything was working in Juneau when we left.  And the reason I know we did is that is because the refrigeration – like I said, the freezer alarm went off, and I guess it shuts off every two days or something like that and reboots itself, and we didn't know what was going, so we checked all the alarms that morning.**

Captain Berry further testified regarding the scope of the areas and topics covered in the meetings and orientations with Mr. James Edson as follows:[20]

Q.   And do you have any understanding with respect to whether Palmer Thomassen looked over the vessel after he was hired as an engineer?

A.   **After that he and I both looked over the vessel with Jim Edson. Remember I said I did it once without Palmer there, and then we did it again with Palmer there, with Jim Edson.  We just – but we never went in again.  Again, the lazarette and aft area was all covered.  So as much as we could, and we both made mental notes.**

Q    Is it your experience that the captain of a fishing vessel like the Kupreanof relies on the engineer to monitor the mechanical systems of the vessel?

Mr. ANDERSON: Objection.  Form.

**THE WITNESS: Yes.**

---

[20]   Id. at p. 81, l. 17 – p. 82, l. 5.

10

1          Captain Berry testified that the Vessel was seaworthy when it left

2    Petersburg. Either Captain Berry or Engineer Palmer Thomassen was free to move a

3    piece of fishing equipment and inspect the lazarette on June 7, or 8, or 9 or 10 up until

4    the time when the back deck was swamped with water. On June 9 in Juneau, Captain

5    Berry or Engineer Palmer Thomassen could have moved the fishing equipment and

6    checked the lazarette. In addition, when the Vessel was at a safe and quiet anchorage

7    before departing on the voyage, Captain Berry or Engineer Palmer Thomassen could

8    have moved the fishing equipment and checked the lazarette. At the moment when the

9    Captain and Engineer realized that the aft deck was swamped with water, however,

10   opening a lazarette hatch would have been foolhardy, suicidal and unreasonable. At

11   that time, the fishing equipment served to hold the lazarette hatches in place as the

12   water came over the back deck which prevented the flooding of the lazarette.

13         There is undisputed evidence that the pump worked to pump some water out of

14   the lazarette. There is substantial evidence that there was only a small quantity of

15   water in the lazarette. There is substantial evidence that the small quantity of water

16   was successfully pumped from the lazarette. The speculation regarding a rag, which

17   was never suggested in the disclosures or in the discovery responses, is unfounded.

18   Unfounded speculation is not sufficient to raise a factual dispute.

19         The alarms were tested and the alarms worked. The Captain, Engineer and

20   crew each testified that no alarm, no siren and no horn sounded at any time to indicate

21   that there was water in the lazarette which is plausible because there was no water in

11

1    the lazarette.

2        All of the testimony is consistent.   Claimants' unfounded speculation is not

3    supported by and is contrary to the facts.

4                    **Claimants Never Address The Fuel Burn Procedure**

5        The McFarland Expert Report summarizes the facts regarding the fuel burn

6    procedure as follows:[21]

7        In Captain Berry's deposition he is clear in reporting that when the Vessel first listed over
8        to port, on June 10, 2015, his first thought was to pull fuel from the port fuel tanks
9        because he had been burning off the starboard fuel tanks.
10
11       In the United States MSTI Ken Farah interview notes of the T/V Kupreanof crew interview
12       of Engineer Palmer Thomassen, on Page 1, Engineer Thomassen states they were burning
13       fuel from the stern tanks when they left Juneau.
14
15       Then, in MST1 Ken Farah's notes, Page 1, at some point while underway, Engineer
16       Thomassen reported to Captain Berry at 0300-0315 hours (3:00 – 3:15 am) on June 10,
17       2015 that there was a list and Captain Berry replied that he was burning off one tank.
18
19       Engineer Thomassen also reported to Mr. Farah, as he notes, that the fuel tank cross over
20       connection was closed.
21
22       In Captain Berry's deposition, on Page 65, Line 11 and Page 66, Lines 11-22, he
23       establishes that at 3:00 am local time on June 10, 2015, he and Engineer Thomassen
24       were discussing that, even with waves occasionally breaking over the deck edge
25       (bulwarks) onto the deck, they were still clearing the water, and stated that "boy, this
26       boat rides really nice, she's handling great, it's going to be a good boat" and "wow, this
27       still handles really nice."
28
29       Captain Berry then reports, in his deposition, Page 71, Line 22 to Page 71 Line 3, that at
30       3:00 am he and Engineer Thomassen were talking about the boat listing, and at that time
31       Captain Berry admits to be burning off only one fuel tank. Captain Berry went to the
32       engine room to switch fuel valves to pull fuel out of the other tank (port) and by that
33       time the Vessel was into a heavy port list.
34

_____

[21]       Exhibit M, Docket 75-6, pp. 20 – 21.

Captain Berry reports, in his deposition page 71, Lines 4-14 that there were no crossover lines but instead there were fuel tank valves that open and closed, with one open and the other closed.

Captain Berry also identified the problem.  The Memorandum filed by Claimants describes and acknowledges the problem with the fuel burn procedure followed by Captain Berry and Engineer Palmer Thomassen:[22]

> Although he never thought it likely, Captain Berry weighed the possibility that the list might be due to fuel burning off the port fuel tanks. To address this possibility, he switched to the starboard tank.  The port stern list, continued; and, in fact, got progressively worse.

By that time, the switch to the other fuel tank was too late.  Opening a lazarette hatch for no reason at that time would have been foolhardy, suicidal and unreasonable.

The McFarland Expert Report finds that the most likely cause for the sinking was the fuel burn procedure of Captain Berry and Engineer Palmer Thomassen that led to the list and sinking.  Claimants offer no contrary expert analysis.

**If The Court Admits Any Agency Report,**
**The Court Should Admit The United States Coast Guard Report**

Claimants rely on the NTSB Report.  If an agency report is deemed admissible, the United States Coast Guard Report ("Coast Guard Report") should be admitted by this Court.  The Coast Guard prepared and issued a REPORT OF INVESTIGATION INTO THE SINKING OF THE FISHING VESSEL KUPREANOF IN THE GULF OF ALASKA NEAR THE FAIRWEATHER GROUNDS dated 30 September 2015.  In the

---

[22]     Docket 69, pp. 6 – 7.

13

"**Conclusions:**" section at page 5, the Report states in pertinent part:[23]

      1.    In accordance with reference (a), <u>the initiating event for this casualty was the flooding of the F/V KUPREANOF's stern due to sea state and weather</u>.

      2.    The causal factors that led to the casualty are as follows:

      a)    <u>Weather conditions exceeded the seaworthiness of the F/V KUPREANOF</u>.

      b)    <u>The master failed to verify the updated weather report</u>.

. . .

In the "**Administrative Recommendations:**" section at page 6, the Report states:[24]

      1.    It is recommended that the Officer in Charge, Marine Inspection for Southeast Alaska initiate an enforcement action against the operator, [Mr. Stephen Berry] for violation of Title 46, United States Code, Section 2302(a), <u>operating a vessel in a negligent manner so as to endanger the life, limb or property of a person</u>.

      2.    <u>It is recommended that this casualty investigation be closed</u>.

Plaintiff/Petitioner would like to be able to rely on the Coast Guard Report which was prepared by the primary agency with jurisdiction over commercial vessels and the only agency that undertook any investigation. The Coast Guard Report is consistent with the factual discussion of the Claimants developed and discussed in the McFarland

---

[23]    (Emphasis added).

[24]    (Emphasis added).

14

1    Expert Report prepared and submitted by Plaintiff/Petitioner.[25]   The admissibility of

2    agency reports is addressed in another pending MOTION.[26]   Plaintiff/Petitioner is not

3    formally attaching the Coast Guard Report which was provided by the Coast Guard as

4    an exhibit because of clear Congressional prohibitions against its use and against the

5    use or reliance of it or the NTSB Report in a civil action.

6                    **Plaintiff/Petitioner Has Paid All Maintenance And Cure:**
7                    **The Journey To Solicit Information Has Been Trying**
8
9            In an abundance of caution and an expression of concern, Plaintiff/Petitioner

10   paid all of Yolanda Perez Orozco's maintenance and cure.  Plaintiff/Petitioner sought

11   to pay Marcos Carrillo's maintenance and cure but was thwarted by Claimant who

12   would not provide any information and, for the reasons discussed below, waived any

13   possible claim for maintenance and cure.

14           Plaintiff/Petitioner has sought to determine the amount of Claimants' claims for

15   maintenance and cure.  In discovery responses provided in 2016, Plaintiff/Petitioner

16   detailed the efforts to that date to determine the amount of maintenance and cure.[27]

17           INTERROGATORY NO. 3: Please set forth in detail all cure you have paid in relation to

18           claimant Yolanda Perez.  For each item of cure noted, please set forth who was paid, the

19           amount paid, the form of payment, the date paid, and the entity that paid it.

20           RESPONSE:

---

[25]      Exhibit M, Docket 75-6.

[26]      Docket 72.
[27]      Angelette, LLC Discovery Responses, Exhibit U, pp. 2 - 16.

15

1    This interrogatory is compound, unduly burdensome and overly broad. Notwithstanding
2    this objection, Plaintiff/Petitioner responds as follows.

3    In a written statement from Captain Berry to Sea-Mountain Insurance dated June 14, 2015,
4    Captain Berry states that Ms. Perez Orozco has sought medical assistance for emotional
5    trauma.

6    In a written statement from Captain Berry to "Darin Hopper" with Sea-Mountain
7    Insurance dated June 6 [sic], 2015, Captain Berry states that he had Ms. Perez Orozco file
8    with the Fishermen's Fund.

9    Angelette, LLC understood that Ms. Perez presented some or all of her claims to the
10   Fishermen's Fund in Petersburg in June or July, 2015.

11   In a letter dated June 18, 2015, Mr. Thomassen expressed concern for the Captain and
12   crew members and requested each to "keep me informed of your circumstances." The
13   Angelette, LLC provided a check for $2500 to the Captain and to each crew member.

14   June 18, 2015

15

16   Dear Stephen, Palmer, Yolanda and Marcos,

17   I am pleased that everyone got off the KUPREANOF safely. I commend your
18   calm and patience.

19   At this time, I too am accepting and dealing with the loss of the vessel. Insurance
20   coverage is not clear at this time.

21   I have received a copy of the lost personal property for each of you. At this time, I
22   would like to provide each of you with $2500. This payment does not mean that
23   you are not entitled to more.

24   Please keep me informed of your circumstances. Thank you.

16

1

2                                    Sincerely,

3                                    [Signed]

4                                    Jay

5        A copy of this letter was provided with the Initial Disclosures.

6                Mr. Jonathan Gilzean with the law firm Latti & Anderson LLP in Boston,
7        Massachusetts sent a letter dated June 30, 2015 to Mr. Shamburek and made a general
8        demand for maintenance and cure for Ms. Perez Orozco.  The letter did not provide any
9        specific sum for maintenance or any amount for cure.

10               Mr. Danny Alberto with Mr. Gilzean's office sent a letter dated July 29, 2015 to
11       Mr. Shamburek and provided the name and address of Mr. Perez Orozco's physician as
12       follows:

13       Dr. Samuel Christojohn

14       1150 Indian Hills Road, 240

15       Mission Hills, CA 91345

16       818-365-1668

17       Angelette, LLC would not learn for some time that this note 1) transposed the name of the
18       doctor, 2) provided an incorrect address and 3) provided an incorrect address for the
19       former address.

20       Mr. Alberto also calculated maintenance using the following monthly obligations for Ms.
21       Perez Orozco:

22       Rent          $700

                                            17

| 1 | Gas | $13.31 |
| 2 | Water | $34.61 |
| 3 | Sanitation | $32.92 |
| 4 | Electric | $55.60 |
| 5 | Food | $374.10 |
| 6 | | _____ |
| 7 | | $1,210.54 total or $40.35 per day. |

8    Mr. Alberto provided copies of Ms. Perez Orozco's receipts and bills as attachments to the
9    letter to support these amounts.  The Angelette, LLC paid the amount of $40.35 per day in
10   maintenance.  In response to a demand by the law firm, the checks were sent to the law
11   firm in Boston rather than to Ms. Perez Orozco in California.

12   Mr. Gilzean sent an e-mail note dated July 28 seeking unspecified medical care from "Dr.
13   Samuel Christojohn" at the address noted above.  Angelette, LLC would not learn for
14   some time that this note 1) transposed the name of the doctor, 2) provided an incorrect
15   address and 3) provided an incorrect address for the former address.

16   In response to a letter from Mr. Gilzean, Mr. Shamburek sent the following letter:

17   July 20, 2015
18
19   Mr. Jonathan E. Gilzean
20   Latti & Anderson LLP
21   30-31 Union Wharf
22   Boston, Massachusetts 02109
23
24   Re:    F/V KUPREANOF / Ms. Yolanda Perez Orozco
25
26   Dear Mr. Gilzean,

I am advising Angelette LLC, the owner of the F/V KUPREANOF.[28]  I received a forwarded copy of your letter dated June 30, 2015 regarding Ms. Yolanda Perez Orozco.  Please provide additional information regarding the claim.

If you have any questions, please contact me at the telephone numbers noted above or send an e-mail note.  Thank you for your attention to this matter. Best wishes.

                              Sincerely,

                              THE LAW OFFICE OF STEVEN J. SHAMBUREK

                              [Signed]

                              By: _____
                                        Steven J. Shamburek

A copy of this letter was provided with the Initial Disclosures.

In an e-mail to Mr. Alberto dated August 3, 2015, Mr. Shamburek notes:

Dear Mr. Alberto,

This note follows our conversation on July 30.

Ms. Yolanda Perez was provided with a check for $2500 in June.  The contract she signed four days before the sinking provided for maintenance calculated at $30.00 per day.  You calculate maintenance at $40.35 per day.  The $2500 check covers maintenance at $40.35 per day until August 11 calculated as follows:

| June 10 – 30 | 20 days | $807.00 |
| July | 31 days | $1250.85 |
| August | 11 days | $443.85 |
| Total | | $2501.70 |

---

[28]      I have not agreed to accept service of process.

1
2  The payment for the remaining days in August is 20 days x $40.35 per day =
3  $807.00.  Should the check for $808.70 ($807.00 plus $1.70) be mailed to her or
4  to you?
5
6  At this time, the insurance coverage issue is uncertain.  At this time, the owner
7  must satisfy financial and legal obligations.  Could you provide some more detail
8  on the surgery today if possible?  Medical billing is byzantine.  All of us benefit if
9  the scope of the medical services and the cost is set forth with care.
10
11  Thank you for your immediate attention to these request.  Best wishes.
12
13  Steve Shamburek
14

15  Mr. Alberto sent a letter dated August 5, 2015 that stated that the vessel owner should

16  contact "Dr. Samuel Christojohn (1150 Indian Hills Road, 240, Mission Hills, CA 91345

17  (818-365-1668)" to make payment.  Angelette, LLC would not learn for some time that

18  this note again 1) transposed the name of the doctor, 2) provided an incorrect address and

19  3) provided an incorrect address for the former address.


20  In an e-mail to Mr. Alberto dated August 5, 2015, Mr. Shamburek notes:

21  Mr. Alberto,
22
23  I received your August 5 letter via e-mail today.
24
25  The Crew/Cook contract in paragraph 8 on "Injury Compensation" signed by Ms.
26  Perez four days before the loss provided for maintenance calculated at $30.00 per
27  day.  You calculate maintenance at $40.35 per day which is a plausible sum.  The
28  payment of $2500.00 was a general payment and should be applied to
29  maintenance.  Under paragraph 11 on "Personal Property Loss" the owner is not
30  responsible for lost personal property.  The remaining maintenance payment for
31  August is being express mailed to your office tomorrow.
32
33  Under the Health Insurance Portability and Accountability Act of 1996 (HIPAA),
34  medical history and records are confidential.  The physician and other health care
35  providers are precluded under federal law from discussing a patient's medical
36  history and treatment with another person without a clear written release.  Under

the circumstance and given the urgency of the situation, providing a release is only a partial and inadequate resolution.  Please have Ms. Perez direct the physician to provide responsive information immediately in writing and a short agreement that can be signed by the owner.  The cost of medical care is not a determining factor.  Ms. Perez has the right to be treated by a physician of her choosing.  Defining the scope of the medical treatment and anticipated costs are reasonable requests.  Your letter seeks an unrestricted oral guaranty of payment for undisclosed services.  A written document is much more definite, certain and prudent.

The contract at paragraph 1 on "Term" and 2 on "Payments" does not include any guaranteed payment provision.  One of the coverage issues with the insurance company is that the season and voyage were scheduled to begin on June 20 and the incident occurred on June 10 before the season and voyage began.

The signed contract at paragraph 13 on "Governing Law" states that any dispute will be governed by the laws of the state of Alaska and that the Crew/Cook submits to the jurisdiction of those courts.  I clerked for years with the federal court in Alaska and followed many of the maintenance and cure disputes.  The court would rather have the parties resolve these matters amiably rather than raising them in court.

Please have Ms. Perez direct the physician and other health care providers to provide responsive information and a short agreement immediately for signature by the owner.

Thank you for your attention to this matter.  Best wishes.

Steve Shamburek

The Angelette, LLC sent a check dated August 26, 2015 to "Christojohn Samuel MD FACS" in the amount of $2500 (Check Number 150) to the address provided by Mr. Alberto.

 The Angelette, LLC sent a check dated September 2, 2015 to "Christojohn Samuel, MD" in the amount of $1503 (Check Number 3363) to the address provided by Mr. Alberto.

21

1    The Angelette, LLC sent a check dated September 2, 2015 to "Christojohn Samuel, MD"
2    in the amount of $2500 (Check Number 3368) to the address provided by Mr. Alberto.

3    In an e-mail from Mr. Alberto dated September 14, 2015, he notes:

4    Attorney Shamburek:
5
6    There appears to be a significant amount of confusion on the vessel owner's part as to the
7    costs that need to be paid in order for Ms. Perez to obtain her surgery.  This process has
8    become far more complicated that it really needs to be and, unfortunately, Ms. Perez is the
9    one who must bear the brunt of all the misunderstanding between your office and the
10   medical providers.
11   Please understand that there are multiple costs relating to the Ms. Perez's hernia surgery.
12   Ms. Perez cannot schedule or undergo her surgery until the following checks are received:
13
14   1.  A check payable to the surgeon, "Dr. Christojohn Samuel" for $2,500.00, mailed to his
15   offices at "418 San Fernando Mission Road, San Fernando, CA 91340."
16   2.  A check payable to the hospital, "Northridge Hospital Medical Center" for $4,003.00,
17   mailed to "Northridge Hospital Medical Center, Attention:  Access Care Department,
18   18300 Roscoe Blvd., Northridge CA 91328."
19   3.  A check payable to the anesthesiologists, "Northridge Anesthesia Medical Group" for
20   $600.00 and mailed to Yolanda Perez at "20336 Colina Drive, Santa Clarita, CA
21   191351."  She has been instructed that she must bring this check to the hospital with her
22   on the date of the surgery to provide to the intake nurse.
23
24   I have spoken with Tami at Dr. Samuel's office who has indicated she has received only 1
25   check so far, payable to "Dr. Samuel" for $1,503.00.  That check, however, was sent to an
26   incorrect address and Tami was able to obtain it only after she collected mail at the
27   doctor's old address.  Pursuant to the attached email you previously sent to me, I
28   understand that the vessel owner may have sent a separate check to Dr. Samuel's office for
29   $2,5000.  Since Tami has indicated she has not yet received that check it appears it was
30   also sent to the wrong address.  Can you confirm that you sent it to the address at bullet
31   point 1 above?  If not, you may wish to cancel payment immediately.  In either event, we
32   ask that you see to it that the three payments highlighted above are made.  Tami has
33   agreed to hold the $1,503.00, check she has received.  If you wish to issue a check for the
34   difference ($2500 - $1503) or have her send back that check to you so that you can rewrite
35   a $2500 check it is your choice.  Since the former route is likely to get Ms. Perez her much
36   needed surgery quicker that is what we would prefer.
37

22

1  As always, please call me if you have any questions.  If you are at all uncertain as to what
2  checks have been received or who must be paid please don't hesitate to contact me.
3
4  Danny
5
6  In this communication, Mr. Alberto provided the correct name for the doctor and a new
7  address for the doctor in another city.  The note acknowledges receipt of the two checks
8  sent to "Christojohn Samuel, MD" by the Angelette, LLC.

9  The Angelette, LLC sent a check dated September 15, 2015 to "Northridge Anesthesia
10  Medical Group" in the amount of $600 (Check Number 3371) to the address provided by
11  Mr. Alberto.

12  The Angelette, LLC sent a check dated September 18, 2015 to "Northridge Hospital
13  Medical Center" in the amount of $2500 (Check Number 3372) to the address provided by
14  Mr. Alberto.

15  In a letter from Mr. Alberto dated October 16, Mr. Alberto **returned the two (2) original**
16  **checks numbered 150 and 3363 and with the words "VOID" written across each**
17  **check**.  **Why two checks sent to and received by Dr. Christojohn Samuel in**
18  **California were sent to Mr. Alberto in Boston, Massachusetts and then sent by Mr.**
19  **Alberto to Mr. Shamburek in Anchorage, Alaska is not explained in Mr. Alberto's**
20  **letter.**  One month and two days before this October 16 letter that returned the checks, Mr.
21  Alberto demanded the payment of these sums to Dr. Christojohn Samuel.

22  In summary, the following checks for cure payments were sent by the Angelette, LLC in
23  September, 2015.  Two checks were returned by Mr. Alberto.

24  Check No: Date:  Amount:      To:                      Disposition:

25  150      8/26   $2500        Christojohn Samuel, MD    Returned on October 16

26  3363     9/2    $1503        Christojohn Samuel, MD    Returned on October 16

23

| 1 | 3368 | 9/2 | $2500 | Christojohn Samuel, MD |
| 2 | 3371 | 9/15 | $600 | Northridge Anesthesia Medical Group |
| 3 | 3372 | 9/18 | $2500 | Northridge Hospital Medical Center |

4 In response to a conversation with Mr. Gilzean on November 3, 2015, Mr. Shamburek

5 sent the following letter:

6 November 5, 2015

8 Mr. Jonathan E. Gilzean
9 Latti & Anderson LLP
10 30-31 Union Wharf
11 Boston, Massachusetts 02109

13 Re: F/V KUPREANOF / Ms. Yolanda Perez Orozco

15 Dear Mr. Gilzean,

17      I am pleased that we could talk on Tuesday.

18      I first began working on and became enamored with admiralty cases when
19 I was clerking for the federal court here in Alaska. I clerked for Judge Holland
20 who handled a boat load of admiralty case including the EXXON VALDEZ case. I
21 was clerking with Judge Fitzgerald when he gathered attorneys in his court room
22 at the end of a day in October, 1986 and stated that he was aware of too many
23 sharp practices and sought more cooperation and collegiality among the admiralty
24 bar. Judge Fitzgerald established an admiralty law society that met for years and
25 became the Admiralty Law Section of the Alaska Bar Association. The judges in
26 Alaska prefer that these matters be handled professionally by counsel to avoid
27 resort to the court.

28      Our voyage has been vexing, but I think we are on course.

29      The Coast Guard Form 2692 "Report of Marine Casualty" notes that no one
30 was injured. A copy in enclosed. The owner was not on notice of any injury.

31 Title 46 U.S. Code § 10603(a) "Seaman's duty to notify employer regarding
32 illness, disability, and injury" states:

33

24

A seaman on a fishing vessel, fish processing vessel, or fish tender vessel <u>shall</u> [footnote omitted] notify the master or individual in charge of the vessel or other agent of the employer regarding any illness, disability, or injury suffered by the seaman when in service to the vessel <u>not later than seven days</u> after the date on which the illness, disability, or injury arose.

(Emphasis added). Ms. Perez never notified the master or individual in charge of any illness, disability, or injury.

In a letter from Mr. Alberto dated June 30, he states that Ms. Perez is "injured" but says nothing about the injury. The letter also states that "all authorizations signed by Ms. Perez are revoked." Ms. Perez had not signed any authorization because the vessel owner was not aware of any injury and thus had not even thought to obtain an authorization or undertake an investigation.

You sent an e-mail note dated July 28 seeking unspecified medical care from "Dr. Samuel Christojohn." This note transposed the name of the doctor, provided an incorrect address and provided an incorrect address for the former address. You also describe Mr. Alberto as an "associate," so I assumed that he is a lawyer.

In a letter dated July 29, Mr. Alberto transposed the name of the doctor, provided an incorrect address in the letter and provided an incorrect address for the former address. Other than the payment of $2500, he did not request any other payments in the letter. Because of plausible privacy and HIPAA concerns, Ms. Tami Lopez with Dr. Christojohn Samuel said she would not talk to Mr. Thomassen or me and directed all questions to Mr. Alberto. Mr. Thomassen caused a check for $2500 to be sent to what turned out to be an incorrect address. The check is number 150.

On July 30, you sent some of Ms. Perez's medical records to me by e-mail attachment.

On September 1, Mr. Alberto sent an e-mail note and included a Northridge Hospital Request For Cash Price document and requested $4003. The owner caused a check to be sent for another $1503. The check is number 3363. In a conversation the two of us had on Friday, September 11, you stated that the sum of $4003 includes the $600 charge for the anesthesiologist but is in addition to the $2500 previously sent. In response, the owner sent another check for $2500. The check is number 3368.

25

In the e-mail note dated September 14 from Mr. Alberto, he provides more detailed information should have been provided in June if it was available. The note requests the sum for $600 for the anesthesiologist. Mr. Thomassen caused a check for $600 to be sent.

In a letter from Mr. Alberto dated October 13, he states that Mr. Thomassen should contact Dr. Shirley Sotelo to approve payment for counseling. Mr. Thomassen contacted Dr. Shirley Sotelo's office and approved payment. Mr. Thomassen stated that the receptionist spoke very broken English. If you will provide a written contract or agreement that he can sign, this matter could be resolved quickly and simply.

The owner has copies of the checks and express mail documents to show the efforts to send the checks.

Mr. Thomassen or his bookkeeper sent all the checks to California as directed. Someone wrote "Void" on two of the checks without attempting to negotiate them. Mr. Alberto sent the checks from Massachusetts to me. He returned checks with check numbers 150 and 3363. Copies are enclosed.

I assumed that Mr. Alberto is an associate attorney. He held himself out as an attorney. He does not appear to be an attorney. The two of us need to work together to untangle his mess.

In our conversation on Tuesday, I understand that at this time the surgery for Ms. Perez has been completed and also paid for by Med Cal. There may be a lien for services. Please keep the owner and me informed of any demand for payment or indemnification of any kind as soon as you receive it.

If you have any questions, please contact me at the telephone numbers noted above or send an e-mail note. Thank you for your attention to this matter. Best wishes.

Sincerely,

THE LAW OFFICE OF STEVEN J. SHAMBUREK

[Signed]

By: _____

Steven J. Shamburek

26

Enclosures:    Copy of Coast Guard Form 2692
Copy of checks with check numbers 150 and 3363

A copy of this letter was provided with the Initial Disclosures.

Counsel for Ms. Perez stated that Ms. Perez was seeking counseling with Ms. Shirley Sotelo at Comprehensive Community Health Center.  A letter was sent to Ms. Shirley Sotelo:

November 13, 2015

Ms. Shirley Sotelo
Comprehensive Community Health Center
12157 Victory Blvd.
North Hollywood, California   91606

Re:    F/V KUPREANOF / Ms. Yolanda Perez Orozco

Dear Ms. Sotelo,

I understand that you are providing counseling services for Ms. Yolanda Perez Orozco.  Please see a copy of the letter Mr. Danny Alberto dated October 13, 2015.  I understand that Mr. Jay Thomassen, the owner of Angelette, LLC which is the owner of the T/V KUPREANOF, contacted your office to address payment for these counseling services.  Would you confirm in writing that payment arrangements have been established to your satisfaction?  I called your office two weeks ago and did not receive a response.

If you have any questions, please contact me at the telephone numbers noted above or send an e-mail note.  Thank you for your attention to this matter.  Best wishes.

Sincerely,

THE LAW OFFICE OF STEVEN J. SHAMBUREK

[Signed]

27

By: _____
                    Steven J. Shamburek

Enclosures:        Letter from Mr. Alberto dated October 13, 2015

A copy of this letter was provided with the Initial Disclosures.

        Without receiving any response to the letter dated November 13, 2015, Mr. Shamburek sent the following letter:

November 20, 2015

Mr. Jonathan E. Gilzean
Latti & Anderson LLP
30-31 Union Wharf
Boston, Massachusetts 02109

Re:    F/V KUPREANOF / Ms. Yolanda Perez Orozco

Dear Mr. Gilzean,

        I have not heard anything from you regarding maintenance and cure payments.  I sent a letter to Ms. Shirley Sotelo last Friday without any response from her.  A copy is enclosed.

        If you have any questions, please contact me at the telephone numbers noted above or send an e-mail note.  Thank you for your attention to this matter.  Best wishes.

                              Sincerely,

                              THE LAW OFFICE OF STEVEN J. SHAMBUREK

                              [Signed]

                              By: _____
                                    Steven J. Shamburek

28

Enclosures:     Copy of Letter to Shirley Sotelo dated November 13, 2015

A copy of this letter was provided with the Initial Disclosures.

      Without receiving any response to the letter dated November 20, 2015, Mr. Shamburek sent the following letter:

December 3, 2015

Mr. Jonathan E. Gilzean
Latti & Anderson LLP
30-31 Union Wharf
Boston, Massachusetts 02109

Re:    F/V KUPREANOF / Ms. Yolanda Perez Orozco

Dear Mr. Gilzean,

      I have not heard anything from you regarding maintenance and cure payments.  I sent a letter to Ms. Shirley Sotelo without any response from her.  A copy was enclosed in my letter to you dated November 20, 2015.  What services is she providing?  She will not respond to a telephone call or a letter.

      Mr. Thomassen and I sought to contact Family Time Centers.  The website at http://www.familytimecenters.com/ triggers the following warning:

This site ahead contains malware.

Attackers currently on www.familytimescenter.com might attempt to install dangerous programs on your computer or delete information (for example, photos, passwords, messages, and credit cards).

1    Would you send a draft contract today for the medical services at Family
2    Times Center sought by Ms. Perez?  The owner will sign it and forward it before
3    the December 5 date.
4
5    You need to focus on this matter.  This seems to be calculated confusion
6    on your part.  Another experienced admiralty attorney suggested that this may be
7    an effort to make a case that the owner did not satisfy the cure obligation.
8
9    If you have any questions, please contact me at the telephone numbers
10   noted above or send an e-mail note.  Thank you for your attention to this matter.
11   Best wishes.
12
13                              Sincerely,
14
15                              THE LAW OFFICE OF STEVEN J. SHAMBUREK
16
17                              [Signed]
18
19                              By: _____
20                                    Steven J. Shamburek
21
22   A copy of this letter was provided with the Initial Disclosures.

23       Mr. Gilzean sent a letter dated December 8, 2015 disputing the daily amount of the

24   maintenance, yet the daily amount paid by the Angelette, LLC is the precise amount he

25   demanded and more than the amount Ms. Perez agreed to in writing ten (10) days before

26   the loss.  Mr. Shamburek sent the following letter:

27   December 14, 2015
28
29   Mr. Jonathan E. Gilzean
30   Latti & Anderson LLP
31   30-31 Union Wharf
32   Boston, Massachusetts 02109
33
34   Re:    F/V KUPREANOF / Ms. Yolanda Perez Orozco
35
36   Dear Mr. Gilzean,
37

Your letter dated December 8, 2105 reflects the problems dealing with your office.  Review the maintenance payments.  The owner has paid the daily amount demanded by your office without question since you first made a demand for payment.

       I sent a letter to Ms. Shirley Sotelo without any response from her.  A copy was enclosed in my letter to you dated November 20, 2015.  What services is she providing?  She will not respond to a telephone call or a letter.  Would you send a draft contract today for medical services sought by Ms. Perez?

       Would you send a draft contract today for the medical services at Family Times Center sought by Ms. Perez?

       You need to focus on this matter and provide some assistance.

       If you have any questions, please contact me at the telephone numbers noted above or send an e-mail note.  Thank you for your attention to this matter.  Best wishes.

                              Sincerely,

                              THE LAW OFFICE OF STEVEN J. SHAMBUREK

                              [Signed]

                              By: _____
                                    Steven J. Shamburek


A copy of this letter was provided with the Initial Disclosures.

       A letter dated January 20, 2016 from Mr. Trueb was sent by e-mail and USPS demanding maintenance and cure and was received that day by e-mail and then in the mail.

       The Claim filed with the federal court by Ms. Perez on January 20, 2016 also demanded maintenance and cure and was received that day by e-mail and then in the mail.

                                    31

1       A letter dated January 26, 2016 from Mr. Trueb was sent by e-mail and USPS and
2 provided some medical releases and was received that day. The releases were received via
3 USPS on January 28, 2016 and sent via certified mail (green card) on January 28, 2016 to
4 each health care provider as follows:

5       Petersburg Medical Center, P.O. Box 589, Petersburg, Alaska 99833

6       Northridge Hospital Medical Center, 18300 Roscoe Blvd., Northridge, CA 91328

7       Christojohn Samuel, MD, 11550 Indian Hills Road, Suite 240, Mission Hills,
8 California 91345

9       Ronald Kaufman, PSY.D, Family Medical Center, 1250 Ventura Blvd., Ste. 102,
10 Valley Village, California 91607.

11       A letter dated January 26, 2016 from Mr. Trueb was sent by e-mail and USPS and
12 was received that day by e-mail and then in the mail and asked that the maintenance
13 checks be sent to: 20336 Colina Dr., Santa Clarita, California 91351-6945.

14       The letter with the release sent to Petersburg Medical Center, P.O. Box 589,
15 Petersburg, Alaska 99833 was signed for by the recipient on February 3, 2016.

16       The letter with the release sent to Northridge Hospital Medical Center, 18300
17 Roscoe Blvd., Northridge, CA 91328 was signed for by the recipient on February 1, 2016.

18       The letter with the release sent to Christojohn Samuel, MD, 11550 Indian Hills
19 Road, Suite 240, Mission Hills, California 91345 was returned as "Return To Sender
20 Insufficient Address Unable To Forward" on February 4, 2016.

21       The letter with the release sent to Ronald Kaufman, PSY.D, Family Medical
22 Center, 1250 Ventura Blvd., Ste. 102, Valley Village, California 91607 was returned as
23 "Return To Sender Insufficient Address Unable To Forward" on February 5, 2016.

32

1         Records from Petersburg Medical Center, P.O. Box 589, Petersburg, Alaska

2   99833 were sent on February 11, 2016 and received on February 13 or 14, 2016.

3         In early February, 2016, HealthPort, 120 Bluegrass Valley Parkway, Alpharetta,

4   GA 3005 sent a response for Northridge Hospital Medical Center, 18300 Roscoe Blvd.,

5   Northridge, CA 91328 and required a payment of funds to release the records.

6         These requests for payment were timely sent to the Angelette, LLC. The

7   Angelette, LLC is still trying to determine what bills remain outstanding.

8         The written agreement signed by the Angelette, LLC to pay for Ms. Perez

9   Orozco's medical expenses referenced above is attached.[29] Copies of the two checks

10   returned by the Boston law firm referenced above are attached.[30]

11         After providing these discovery responses, Plaintiff's/Petitioner's counsel sent

12   additional letters to counsel for Claimants trying to discern any unpaid obligations.[31]

13         In a letter dated May 23, 2016, counsel for Plaintiff/Petitioner requested the

14   following information:

15   May 23, 2016

16

17   . . .

18

19   Re: Cure for Claimant Ms. Yolanda Perez Orozco

20

21   Dear Lanning and Doug,

---

[29]    Exhibit T, p. 22.

[30]    Id. at p. 23 (routing number and account number redacted).

[31]    Exhibit T, Affidavit of Steven J. Shamburek, pp. 1 – 2 and pp. 3 - 20.

33

Angelette, LLC spent almost seven months dealing with the machinations of the Boston attorneys. Angelette, LLC tried to sort out who should be paid for Ms. Perez Orozco's cure, how much should be paid and at what address the payments should be sent. That effort is set forth in careful and chronological detail in Plaintiff's/Petitioner's Response to Ms. Perez Orozco's Interrogatory Number 3.

The releases you sent in January were sent out the same day they were received with a green card. The responses as of the date to provide Plaintiff's/Petitioner's discovery responses, April 20, are set forth in the Plaintiff's/Petitioner's Response to Ms. Perez Orozco's Interrogatory Number 3. Interrogatory Numbers 3 and 4 state:

INTERROGATORY NO. 3: Please set forth in detail all cure you have paid in

relation to claimant Yolanda Perez. For each item of cure noted, please set forth

who was paid, the amount paid, the form of payment, the date paid, and the entity

that paid it.

RESPONSE:


INTERROGATORY NO. 4: Please set forth each and every demand you have

received from Yolanda Perez and/or her attorney Lanning M. Trueb, since

January 1, 2016, for the payment of maintenance and cure. For each demand,

please set forth the date you received the demand, a list of the documents

accompanying each demand, your response to each demand, and the date of your

response to each demand.

RESPONSE:


The responses from the providers to the releases sent to them by Angelette, LLC are noted in Plaintiff's/Petitioner's Response to Interrogatory Number 3. Since that time, April 20, there have not been any requests for payments or bills from any of these providers to Angelette, LLC.

34

1    To avoid any later disputes over the scope and breadth of the discovery
2    requests from Angelette, LLC, Angelette, LLC cut and pasted the instructions in
3    the discovery requests from Ms. Yolanda Perez Orozco into the discovery
4    requests sent to Ms. Yolanda Perez Orozco.
5
6    Plaintiff's/Petitioner's Interrogatory Numbers 12 – 15 track the companion
7    interrogatories provided by Ms. Yolanda Perez Orozco to Plaintiff/Petitioner.
8    Interrogatory Numbers 12 - 15 state:
9
10   INTERROGATORY NO. 12:  Please set forth each and every demand you
11   have made personally or through counsel for the payment of cure.  For each
12   demand, please set forth the date you made the demand, a list of the
13   documents accompanying each demand, the response to each demand,
14   and the date of the response to each demand.
15   RESPONSE:
16
17   INTERROGATORY NO. 13:  Please set forth each and every demand you
18   have made personally or through counsel for the payment of maintenance.
19   For each demand, please set forth the date you made the demand, a list
20   the documents accompanying each demand, the response to each demand,
21   and the date of the response to each demand.
22   RESPONSE:
23
24   INTERROGATORY NO. 14:  Please set forth in detail all cure you have
25   been paid.  For each item of cure noted, please set forth who made the
26   payment, the amount paid, the form of payment, the date paid, and the
27   entity that paid it.
28   RESPONSE:
29
30   INTERROGATORY NO. 15: Please set forth in detail all maintenance you
31   have been paid.  For each item of maintenance noted, please set forth who
32   made the payment, the amount paid, the form of payment, the date paid,
33   and the entity that paid it.
34   RESPONSE:
35   The discovery responses to these four interrogatories dated May 17 from Ms.
36   Perez Orozco do not provide any specific responses.  See pages 11 – 13 of the
37   Claimant Yolanda Perez Orozco's Response To Petitioner's First Discovery
38   Request dated May 17, 2016.  The response to Interrogatory Number 14 includes
39   a list of documents yet not a response to the interrogatory itself.  This specific

35

information is critical because the providers are not sending requests for payments or bills to Angelette, LLC.

You object to the discovery responses of the Angelette, LLC to Ms. Perez Orozco's discovery requests in your letter dated May 4, 2016. Review your objections in light of your responses to the discovery requests from Angelette, LLC. Angelette, LLC is concerned that it has not received any meaningful responses to many of these discovery requests and other discovery requests.

Thank you for your attention to this matter.

In a letter dated June 7, 2016, counsel for Plaintiff/Petitioner requested the following information:

June 7, 2016

. . .

Re: Bill from FamilyTime Center for Claimant Ms. Yolanda Perez Orozco

Dear Lanning,

I forwarded your letter dated May 25, 2016 regarding the FamilyTime Center bill to Angelette, LLC. Angelette, LLC sent a check number 3450 dated April 22, 2016 to FamilyTime Center. A copy of the check is enclosed along with a copy of the maintenance check for June. Look at the billing statement from FamilyTime Center attached to your letter and marked as 100402. FamilyTime Center is sending bills to your office and not to Angelette, LLC. The address of Angelette, LLC is:

Angelette, LLC
P.O. Box 188
Seward, Alaska  99664

The address of Angelette, LLC is on the checks that have been sent to and received by FamilyTime Center. If FamilyTime Center will communicate directly with Angelette, LLC, this process could be abbreviated and the bills satisfied much more quickly.

36

1    Thank you for your attention to this matter.
2
3    In a letter dated June 11, 2016, counsel for Plaintiff/Petitioner requested the
4    following information:

5    Saturday morning, June 11, 2016
6
7    . . .
8
9    Re:  Outstanding Cure For Ms. Yolanda Perez Orozco and Mr. Marcos Carrillo
10
11   Dear Lanning,
12
13              **<u>Please forward any outstanding medical bills.</u>**
14
15   As of today, there have not been any requests for payments or bills from
16   any of the health care providers to Angelette, LLC other than your letter of May
17   25 forwarding a bill from FamilyTime Center that was sent to your office and not
18   to Angelette, LLC.  In a letter dated June 7 from me to you, Angelette, LLC seeks
19   to have FamilyTime Center send the bills directly to Angelette, LLC.  The letter
20   notes:
21
22       I forwarded your letter dated May 25, 2016 regarding the FamilyTime
23       Center bill to Angelette, LLC.  Angelette, LLC sent a check number
24       3450 dated April 22, 2016 to FamilyTime Center.  A copy of the check is
25       enclosed along with a copy of the maintenance check for June.  Look at
26       the billing statement from FamilyTime Center attached to your letter and
27       marked as 100402.  FamilyTime Center is sending bills to your office
28       and not to Angelette, LLC.  The address of Angelette, LLC is:
29
30       Angelette, LLC
31       P.O. Box 188
32       Seward, Alaska  99664
33
34       The address of Angelette, LLC is on the checks that have been sent to
35       and received by FamilyTime Center.  If FamilyTime Center will
36       communicate directly with Angelette, LLC, this process could be
37       abbreviated and the bills satisfied much more quickly.
38

37

1    Thank you for your attention to this matter.
2
3    **Please forward any outstanding medical bills.**
4
5    Thank you for your attention to this matter.  Call me with any questions,
6    comments or concerns.  Best wishes.
7
8    In a letter dated June 30, 2016, counsel for Plaintiff/Petitioner requested the

9    following information from counsel for all the Claimants:

10   June 30, 2016
11
12   . . .
13
14   Dear Lanning, Dave and Yale,
15
16   Neither the Angelette, LLC nor the undersigned have received any bills,
17   invoices or demands of any kind in the last six weeks.  None of the third party
18   providers are providing any bills, invoices or demands.  Each of the discovery
19   requests served on the four claimants seeks such bills, invoices and demands.
20   Please forward any supplemental disclosures and discovery responses including
21   any bills, invoices and demands.
22
23   Thank you for your attention to this matter.  Call me with any questions,
24   comments or concerns.  Best wishes.
25
26   In a letter dated July 7, 2016, counsel for Plaintiff/Petitioner requested the

27   following information:

28   July 7, 2016
29
30   . . .
31
32   Re:  Cure claims for Claimants Ms. Yolanda Perez Orozco and Mr. Marcos
33   Carrillo
34
35   Dear Lanning,
36
37   In a letter to you one month ago dated June 7, 2016, I noted:

38

Re:  Bill from FamilyTime Center for Claimant Ms. Yolanda Perez Orozco

Dear Lanning,

I forwarded your letter dated May 25, 2016 regarding the FamilyTime Center bill to Angelette, LLC.  Angelette, LLC sent a check number 3450 dated April 22, 2016 to FamilyTime Center.  A copy of the check is enclosed along with a copy of the maintenance check for June.  Look at the billing statement from FamilyTime Center attached to your letter and marked as 100402.  FamilyTime Center is sending bills to your office and not to Angelette, LLC.  The address of Angelette, LLC is:

Angelette, LLC
P.O. Box 188
Seward, Alaska  99664

The address of Angelette, LLC is on the checks that have been sent to and received by FamilyTime Center.  If FamilyTime Center will communicate directly with Angelette, LLC, this process could be abbreviated and the bills satisfied much more quickly.

In another letter sent on Saturday morning, June 11, 2016, I noted:

Re:  Outstanding Cure For Ms. Yolanda Perez Orozco and Mr. Marcos Carrillo

Dear Lanning,

**Please forward any outstanding medical bills.**

As of today, there have not been any requests for payments or bills from any of the health care providers to Angelette, LLC other than your letter of May 25 forwarding a bill from FamilyTime Center that was sent to your office and not to Angelette, LLC.  In a letter dated June 7 from me to you, Angelette, LLC seeks to have FamilyTime Center send the bills directly to Angelette, LLC.  The letter notes:

I forwarded your letter dated May 25, 2016 regarding the FamilyTime Center bill to Angelette, LLC.  Angelette, LLC sent a check number 3450 dated April 22, 2016 to FamilyTime Center.  A copy of the check is enclosed

along with a copy of the maintenance check for June. Look at the billing statement from FamilyTime Center attached to your letter and marked as 100402. FamilyTime Center is sending bills to your office and not to Angelette, LLC. The address of Angelette, LLC is:

Angelette, LLC
P.O. Box 188
Seward, Alaska 99664

The address of Angelette, LLC is on the checks that have been sent to and received by FamilyTime Center. If FamilyTime Center will communicate directly with Angelette, LLC, this process could be abbreviated and the bills satisfied much more quickly.

Thank you for your attention to this matter.

**Please forward any outstanding medical bills.**

Thank you for your attention to this matter. Call me with any questions, comments or concerns. Best wishes.

(Emphasis in original).

A month later (July 7, 2016) and FamilyTime still has not communicated with Angelette, LLC. The recent Fifth Supplemental Rule 26 Disclosures bury a bill from FamilyTime Center to your office and only your office as the very last page. The letter still does not reflect that it was sent to Angelette, LLC. You mark it as 100422.

The bills from Northridge Hospital Medical Center do not present a demand for payment to Angelette, LLC. In the Plaintiff/Petitioner Response To Claimant Yolanda Perez Orozco's First Discovery Requests To Petitioner date April 20, 2016, Angelette, LLC responded to the following interrogatory in pertinent part:

INTERROGATORY NO. 3: Please set forth in detail all cure you have paid in relation to claimant Yolanda Perez. For each item of cure noted, please set forth who was paid, the amount paid, the form of payment, the date paid, and the entity that paid it.

RESPONSE:

40

1  This interrogatory is compound, unduly burdensome and overly broad.  Notwithstanding
2  this objection, Plaintiff/Petitioner responds as follows.
3  . . .
4
5  The letter with the release sent to Northridge Hospital Medical Center, 18300 Roscoe
6  Blvd., Northridge, CA  91328 was signed for by the recipient on February 1, 2016.
7  . . .
8
9  Despite sending the release you provided to Northridge Hospital Medical Center
10  and receiving a signed certified receipt indicating that Northridge Hospital
11  Medical Center received the release, Northridge Hospital Medical Center has not
12  sent bills to Angelette, LLC.
13
14     The Account Inquiry references "Medi-Cal Contract Adj." and seems to
15  indicate that the amounts have been satisfied.  How much is owed?
16
17     In a letter dated June 10, 2016, Plaintiff/Petitioner sought to determine the
18  cure received by Ms. Perez Orozco.  The letter states in pertinent part:
19
20     Plaintiff's/Petitioner's Interrogatory Numbers 12 – 15 track the companion
21  interrogatories provided by Ms. Yolanda Perez Orozco to Plaintiff/Petitioner.
22  Interrogatory Numbers 12 - 15 state:
23
24  [The letter reprints INTERROGATORY NO. 12 through INTERROGATORY NO.
25  15.]
26     The discovery responses to these four interrogatories dated May 17 from
27  Ms. Perez Orozco do not provide any specific responses.  See pages 11 – 13 of
28  the Claimant Yolanda Perez Orozco's Response To Petitioner's First Discovery
29  Request dated May 17, 2016.   The response to Interrogatory Number 14
30  includes a list of documents yet not a response to the interrogatory itself.  This
31  specific information is critical because the providers are not sending requests for
32  payments or bills to Angelette, LLC.
33
34     You object to the discovery responses of the Angelette, LLC to Ms. Perez
35  Orozco's discovery requests in your letter dated May 4, 2016.  Review your
36  objections in light of your responses to the discovery requests from Angelette,
37  LLC.  Angelette, LLC is concerned that it has not received any meaningful
38  responses to many of these discovery requests and other discovery requests.

41

1
2          Thank you for your attention to this matter.
3
4          I believe that Judge Gleason would prefer that these bills be presented to
5   Angelette, LLC if you believe that Angelette, LLC should be satisfying these
6   bills.
7
8          Thank you for your attention to this matter.
9
10         In a letter dated August 7, 2016, counsel for Plaintiff/Petitioner requested the

11  following information:

12  August 7, 2016
13
14  . . .
15
16  Re:  Cure claims for Claimants Ms. Yolanda Perez Orozco and Mr. Marcos
17  Carrillo
18
19  Dear Lanning,
20
21         In a letter to you two months ago dated June 7, 2016, I noted:
22
23  Re:  Bill from FamilyTime Center for Claimant Ms. Yolanda Perez Orozco
24
25  Dear Lanning,
26
27         I forwarded your letter dated May 25, 2016 regarding the FamilyTime
28  Center bill to Angelette, LLC.  Angelette, LLC sent a check number 3450
29  dated April 22, 2016 to FamilyTime Center.  A copy of the check is enclosed
30  along with a copy of the maintenance check for June.  Look at the billing
31  statement from FamilyTime Center attached to your letter and marked as
32  100402.  FamilyTime Center is sending bills to your office and not to
33  Angelette, LLC.  The address of Angelette, LLC is:
34
35  Angelette, LLC
36  P.O. Box 188
37  Seward, Alaska  99664
38

42

The address of Angelette, LLC is on the checks that have been sent to and
received by FamilyTime Center. If FamilyTime Center will communicate
directly with Angelette, LLC, this process could be abbreviated and the bills
satisfied much more quickly.

In another letter sent on Saturday morning, June 11, 2016, Plaintiff/Petitioner

requested the following:

Saturday morning, June 11, 2016

. . .

Re: Outstanding Cure For Ms. Yolanda Perez Orozco and Mr. Marcos Carrillo

Dear Lanning,

**Please forward any outstanding medical bills.**

As of today, there have not been any requests for payments or bills from
any of the health care providers to Angelette, LLC other than your letter of May
25 forwarding a bill from FamilyTime Center that was sent to your office and not
to Angelette, LLC. In a letter dated June 7 from me to you, Angelette, LLC
seeks to have FamilyTime Center send the bills directly to Angelette, LLC. The
letter notes:

I forwarded your letter dated May 25, 2016 regarding the FamilyTime
Center bill to Angelette, LLC. Angelette, LLC sent a check number 3450
dated April 22, 2016 to FamilyTime Center. A copy of the check is enclosed
along with a copy of the maintenance check for June. Look at the billing
statement from FamilyTime Center attached to your letter and marked as
100402. FamilyTime Center is sending bills to your office and not to
Angelette, LLC. The address of Angelette, LLC is:

Angelette, LLC
P.O. Box 188
Seward, Alaska 99664

The address of Angelette, LLC is on the checks that have been sent to and
received by FamilyTime Center. If FamilyTime Center will communicate

43

1  directly with Angelette, LLC, this process could be abbreviated and the bills
2  satisfied much more quickly.
3
4        Thank you for your attention to this matter.
5
6        **Please forward any outstanding medical bills.**
7
8        Thank you for your attention to this matter.  Call me with any questions,
9  comments or concerns.  Best wishes.
10
11  (Emphasis in original).
12
13        Two months later (August 7, 2016) and FamilyTime still has not
14  communicated with Angelette, LLC.  The recent Sixth Supplemental Rule 26
15  Disclosures include a bill from FamilyTime Center to your office and only your
16  office.  The letter still does not reflect that it was sent to Angelette, LLC.  You
17  mark it as 100423.
18
19        I am sending a letter directly to FamilyTime requesting that the bill be sent
20  to Angelette, LLC.  A copy is enclosed.
21
22      I believe the court would prefer that these bills be presented to Angelette, LLC if
23  you believe that Angelette, LLC should be satisfying these bills.
24
25      Thank you for your attention to this matter.
26
27      . . .
28
29      CC:  Copy of letter to FamilyTime dated August 7, 2016.
30
31      In another letter sent on August 7, 2016, Plaintiff/Petitioner requested the

32  FamilyTime Center to send the bills directly to Angelette, LLC:

33  August 7, 2016
34
35  Ms. Jacquelyn Michael
36  FamilyTime Center
37  1051 Chandler Blvd, Suite 102
38  Valley Village, California  91607
39

44

1    Re:  Ms. Yolanda Perez Orozco
2
3    Dear Ms. Michael,
4
5         Would you send the bill for the sessions for Ms. Yolanda Perez Orozco to
6    Angelette, LLC with a copy to me?  The address of Angelette, LLC is:
7
8    Angelette, LLC
9    P.O. Box 188
10   Seward, Alaska  99664
11
12   The address of Angelette, LLC is on the checks that have been sent to and
13   received by FamilyTime Center.  If FamilyTime Center will communicate
14   directly with Angelette, LLC, this process could be abbreviated and the bills
15   satisfied much more quickly.
16
17        Thank you for your attention to this matter.
18
19        . . .
20
21   CC:     Lanning M. Trueb
22
23   Plaintiff/Petitioner made multiple heroic efforts to determine the unpaid maintenance

24   and cure.

25                  **Plaintiff/Petitioner Paid All Maintenance And Cure**

26        Two interrogatories propounded to Mr. Marcos Carrillo requested the following

27   information:[32]

28        INTERROGATORY NO. 12:  Please set forth each and every demand you have
29        made personally or through counsel for the payment of cure.  For each demand,
30        please set forth the date you made the demand, a list of the documents
31        accompanying each demand, the response to each demand, and the date of the
32        response to each demand.
33   _____

[32]     Exhibit K, Docket 75-4, pp. 2 – 3 (p. 9 – 10 of 18 in original).

45

1       RESPONSE:  I don't know what cure is – and so I'm sure I've never made a
2       demand for cure.
3
4       INTERROGATORY NO. 13:  Please set forth each and every demand you have
5       <u>made personally or through counsel</u> for the payment of <u>maintenance</u>.  For each
6       demand, please set forth the date you made the demand, a list of the documents
7       accompanying each demand, the response to each demand, and the date of the
8       response to each demand.
9
10       RESPONSE:  I don't know what maintenance is – and so I'm sure I've never
11       made a demand for maintenance. . . .
12

13 Mr. Carrillo's responses were prepared and served by counsel but not signed by Mr.

14 Carrillo.[33]  An attorney is an agent of a client and can waive a claim for a client.  As

15 detailed above, Mr. Carrillo never made a demand or a request for maintenance and

16 cure.  Any possible claim was waived years ago.

17      An interrogatory propounded to Ms. Perez Orozco requested the following

18 information:[34]

19       INTERROGATORY NO. 15: Please set forth in detail all maintenance you have
20       been paid.  For each item of maintenance noted, please set forth who made the
21       payment, the amount paid, the form of payment, the date paid, and the entity that
22       paid it.
23
24       RESPONSE:  Claimant did not keep a record of all the maintenance paid.
25       **<u>Claimant notes that she is not claiming Mr. Thomassen is not paying</u>**
26       **<u>maintenance.</u>**  Finally, petitioner is in possession of all the information requested
27       in this interrogatory.
28
29      Counsel for Claimant sent a letter dated July 18, 2016 stating that

---

[33]    <u>Id.</u> at p. 7 (p. 18 of 18 in original).

[34]    Exhibit L, Docket 75-5, p. 2 (p. 13 of 24 in original) (emphasis added).

1  Plaintiff/Petitioner no longer was required to pay maintenance to Ms. Perez Orozco.

2  The letter states:[35]

3      We write to inform you that after talking with her health care provider(s), Ms.
4      Perez applied for a job, and was recently hired by, Universal Studies in the Los
5      Angeles, California area.  She continues with curative treatment from her mental health
6      care providers, but given she is able to return to work, **the payment of maintenance**
7      **may cease immediately**.  Hopefully she is able to function adequate to perform her
8      new job.  We will inform you if her status changes.
9
10     We recently received a letter from you which seemed to be a copy of other letters
11     and/or discovery requests and/or discovery responses.  I apologize, but I am having
12     difficulty understanding what the letter means; and if you want us to do something.
13     Please clarify.
14
15  Plaintiff/Petitioner abided Claimant's direction.

16      In response to the many letters detailed above, Claimants refused to provide

17  any specific information in response to the multiple requests for information.

18      Plaintiff/Petitioner paid all the outstanding cure for Ms. Perez Orozco by March

19  5, 2017.  In the Affidavit of Jay Thomassen dated February 5, 2018,[36] he states:

20      1.    I am the owner of the Plaintiff/Petitioner in this case and have
21      personal knowledge of the following facts, except as specifically noted, and if
22      called to testify, I could and would testify to the matters set out below.
23
24      2.    On February 27, 2017, Mr. Lanning Trueb stated to me that Ms.
25      Yolanda Perez Orozco's total unpaid cure was $2722.83.
26
27      3.    The Angelette, LLC issued a check for this amount and had it hand
28      delivered to Mr. Trueb's office on March 5, 2017.

---

[35]    Exhibit T, p. 21 (emphasis added).

[36]    Exhibit S, Affidavit of Mr. Jay Thomassen dated February 5, 2018.

47

1     4.      Throughout this case, trying to determine what Ms. Yolanda Perez
2     Orozco's cure bills are has been trying.

3     5.      I declare under penalty of perjury that the foregoing is true and correct
4     to the best of my knowledge.

### Conclusion

In a limitation proceeding, the burden of proof is clearly established. The claimant bears the burden of coming forward with and ultimately proving negligence or unseaworthiness and in addition proving that the negligence or unseaworthiness was the proximate case of the loss.[37] If and only if liability is established and the negligence or unseaworthiness is proven to be the proximate case of the loss, then the burden shifts to the shipowner to establish lack of privity or knowledge. Both burdens must be met by a preponderance of the evidence.

In a limitation proceeding, a claimant must establish that the vessel was unseaworthy at the time the vessel began the voyage before the court examines whether unseaworthiness was the cause of the loss of vessel.[38] The fact of a casualty does not connote negligence or unseaworthiness.[39] There is no evidence that the Vessel was unseaworthy on June 7, 2015, the date the Vessel began the voyage. There is no evidence that the owner was negligent. There is overwhelming evidence

---

[37]    Walston v. Lambertsen, 349 F.2d 660, 663 (9th Cir. 1965), cert denied, 382 U.S. 980 (1966) (citations omitted).

[38]    Id.

[39]    Id.

1     that the Vessel was seaworthy.  There is overwhelming evidence that the owner was

2     not negligent.

3          In Walston,[40] the Ninth Circuit states:  "Findings of lack of negligence and of

4     seaworthiness may be upheld as not clearly erroneous either because affirmative

5     evidence supports the findings or because sufficient evidence to the contrary has not

6     been presented by the one upon whom rests the burden of proof."  In this case, more

7     than sufficient evidence supports the finding of a lack of negligence and of

8     seaworthiness.  No admissible evidence to the contrary has been presented by the

9     Claimants.

10          Claimants do not meet the burden of coming forward with any evidence and

11     perforce do not carry their ultimate burden of proof.  All of the other evidence – most all

12     of it provided by Claimants – overwhelmingly supports the conclusion that the Vessel

13     was not unseaworthy and the owner was not negligent.

14          An "immaculate" Vessel performed "perfect[ly]" throughout the voyage until it

15     was swamped with water because of improper fuel burn procedure.

16          This case has gone on for far too long.  All motions were scheduled pursuant to

17     Court Order to be filed and served by January 31, 2018.  Claimants' suggestion that

18     issues regarding maintenance and cure should be addressed later is waived,

19     unsupported and unfounded.

---

[40]     Id. (citation omitted).

49

1   Claimants' Motion should and must be denied.

2   DATED at Anchorage, Alaska, this 12th day of February, 2018.

3                                          LAW OFFICE OF STEVEN J. SHAMBUREK
4                                          Attorney for Plaintiff/Petitioner
5
6                                          /s/ Steven J. Shamburek
7
8                                          By:_____
9                                                Steven J. Shamburek
10                                               ABA No. 8606063
11                                               425 G Street, Suite 610
12                                               Anchorage, Alaska  99501
13                                               Telephone: (907) 522-5339
14                                               shamburek@gci.net
15                                               shambureklaw@gci.net
16                                               shamburekbank@gci.net
17
18                        **CERTIFICATE OF SERVICE**
19
20        I hereby certify that on the 12th day of February, 2018, I filed a copy of the
21   foregoing using this Court's CM/ECF System, which causes a copy to be served on the
22   following:
23
24   Counsel of Record
25
26   /s/ Steven J. Shamburek
27   _____
28   Steven J. Shamburek
29

50